IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | | |
|---|---|---|
| ELIAS BOBADILLA-GERMÁN, et al., | ) ) ) | CV 07-3058-PA |
| Plaintiffs, | ) ) | **FINDINGS OF FACT AND** |
| | ) | **CONCLUSIONS OF LAW** |
| v. | ) ) | |
| BEAR CREEK ORCHARDS, INC., | ) ) | |
| Defendant. | ) | |

**PANNER, Judge.**

On July 16 and 17, 2009, I conducted a court trial. These are my findings of fact and conclusions of law. Fed. R. Civ. P. 52(a)(1).

**FINDINGS OF FACT**

**The Parties**

1.  The plaintiff Class is comprised of seasonal agricultural workers employed by defendant Bear Creek Orchards, Inc. ("Bear Creek") at various times in 2004, 2005 and/or 2006, picking peaches and pears. Some workers also performed orchard maintenance work during harvest season.

2.  The twelve named plaintiffs are the appointed Class Representatives. Each also is a plaintiff, individually, with respect to one or more claims for which no class was certified.

1 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

For brevity, a named plaintiff is referred to herein by the designation Plaintiff.

    3.    Bear Creek is a Delaware corporation registered with the Oregon Secretary of State to do business in the State of Oregon, with its principal place of business in Medford, Oregon.

**Sub-Class Definitions**

    4.    The Court certified the following sub-classes:

| | |
|---|---|
| Sub-class One: | Migrant agricultural workers recruited and employed by Bear Creek Orchards during 2005 or 2006 who did not receive written disclosures at the time of recruitment. |
| Subclass Two-A: | Migrant agricultural workers who, while employed by Bear Creek Orchards during 2004, 2005, or 2006, had a charge for housing deducted from a paycheck, with written authorization from the employee, and the gross pay remaining after the deduction was, in any pay period, less than the legal minimum wage. |
| Sub-class Two-B: | Migrant agricultural workers who, while employed by Bear Creek Orchards during 2004, 2005, or 2006, had a charge for housing deducted from a paycheck, without written authorization from the employee, and the gross pay remaining after the deduction was, in any pay period, less than the legal minimum wage. |
| Sub-Class Three: | [deleted] |
| Sub-class Four: | Migrant agriculture workers who, while employed by Bear Creek Orchards during 2004, 2005, or 2006, had a charge for housing, meals, or subsistence (wage advances) deducted from a paycheck without written authorization from the employee for that deduction. |

**Harvest Work at Bear Creek Orchards**

5.     Each summer, Bear Creek hires seasonal workers to pick peaches and pears in its orchards located around Medford, Oregon.

6.     The timing of the harvest varies somewhat each year. Peach and pear harvest each generally last about a month, with pear harvest commencing a few days after completion of peach harvest.

7.     Bear Creek's peach harvest requires approximately 50 seasonal agricultural workers.  Bear Creek's pear harvest requires approximately 300 seasonal agricultural workers.

8.     Plaintiff Elias Bobadilla-German worked the harvest for Bear Creek in 2004 and 2006.

9.     Plaintiff Jacobo Bobadilla-German worked the harvest for Bear Creek in 2003, 2004, and 2006.

10.     Plaintiff Javier Ceja-Ceja worked the harvest for Bear Creek in 2003 and 2005.

11.     Plaintiff Vicente Fimbres Romero worked the harvest for Bear Creek in 2005 and 2006.

12.     Plaintiff Mauro German-Sanchez worked the harvest for Bear Creek in 2004 and 2006.

13.     Plaintiff Gilberto Padilla-Ortiz worked the harvest for Bear Creek in 2006.

14.     Plaintiff Carlos Palacios-Torres worked the harvest for Bear Creek in 2006.

15.     Plaintiff Jose Pantoja-Ramirez first worked the harvest for Bear Creek in 1997.  With the exception of 2001 and 2005, Pantoja worked for Bear Creek in every year since 1997.

16.  Plaintiff Benjamin Urbalejo-Rodriguez worked the harvest for Bear Creek in 2005 and 2006.

17.  Plaintiff Gilberto Valenzuela-Becerra has worked the harvest for Bear Creek every year since approximately 2000.

18.  Plaintiff Victor Villanueva-Hernandez worked the harvest for Bear Creek in 2000, 2002, 2003, 2004, 2005, and 2006.

19.  Plaintiff Dario Angel Villegas-Meza worked the harvest for Bear Creek each year from 2001 through 2008.

**Recruiting Seasonal Harvest Workers**

20.  Bear Creek has been unable to hire enough seasonal agricultural workers in the Medford region to meet its labor needs.  Bear Creek actively recruits and hires seasonal agricultural workers from other locales.  In recent years, at least three-fourths of the peach and pear pickers employed by Bear Creek have come from outside the Medford region.  Many were recruited from San Luis, Arizona.

21.  Each named Plaintiff and each Class member is a migrant worker who traveled to Oregon to work the harvest for Bear Creek.

22.  During the period relevant to this action, Gumercindo Iboa (also known as "Gume") was the Bear Creek employee primarily responsible for recruiting and hiring seasonal harvest employees.

23.  To facilitate recruitment of migrant harvest workers, Bear Creek offers employees housing at a modest charge.

24.  Bear Creek employed and housed approximately 254 migrant agricultural workers in 2004, 296 migrant agricultural workers in 2005, and 345 migrant agricultural workers in 2006.

/ / / /

25. When recruiting seasonal agricultural workers, Bear Creek gave priority to applicants who had worked the harvest for Bear Creek the prior year, had completed the harvest in good standing, and had earned a "Stay Bonus."

26. To fill the remaining positions, Bear Creek encouraged returning employees to refer friends or relatives.

27. Walk-in applicants were considered for seasonal harvest employment only if the number of returning past employees and referrals was insufficient to fill the available positions.

28. When recruiting, Iboa presumed that individuals previously employed by Bear Creek understood the general terms and conditions of employment, and it was not necessary to restate such information. Iboa's practice was to disclose to them changes from the prior year's wage rates and any significant changes to other terms and conditions of employment.

29. When speaking with prospective new hires who had not previously worked for Bear Creek, Iboa's practice was to provide further details regarding the terms of employment. Iboa also would discuss working conditions such as the weight of a basket of fruit or a picking ladder, that the work would be performed outdoors in hot weather, and the orchard can be muddy.

**Recruiting Seasonal Workers in 2005**

30. Gumercindo Iboa telephoned and/or sent postcards to seasonal harvest workers who had been employed by Bear Creek in previous years and completed the season in good standing. If the individual expressed an intent to return in 2005, his personal information was re-activated in the Company's personnel systems.

31. Plaintiffs Valenzuela-Becerra, Villanueva-Hernandez and Villegas-Meza received postcards inviting them to return for the 2005 harvests.

32. Iboa mailed employment applications to returning past employees who had informed Iboa they knew of others interested in working the 2005 harvest. Completed applications were returned to Bear Creek before the worker arrived in Medford.

33. Seasonal harvest workers generally did not drive the long distance from San Luis, Arizona, to Medford, Oregon, without assurance of employment upon arrival. To manage its labor force, Bear Creek needed to know, and to determine, how many pickers were arriving and when.

34. In 2005, Iboa traveled to San Luis, Arizona, to recruit seasonal harvest workers at Amistad (Friendship) Park, situated adjacent to the border with Mexico. Iboa would stand upon a table in the Park and make a presentation in Spanish, aided by a sound amplification device. A large crowd, sometimes as many as 300 or 400 persons, would gather around to listen.

35. While at the Park, Iboa and one or more assistants collected names of returning employees. Iboa compiled a list of 327 past Bear Creek employees he met in the Park in 2005 who expressed an intent to return for the 2005 harvest. When Iboa returned to Medford, he instructed the appropriate personnel to activate those employees in Bear Creek's database. 271 of those 327 individuals did in fact travel to Medford and return to work for Bear Creek in 2005.

/ / / /

36. At the Park, Iboa and his assistant(s) also distributed job applications to prospective new hires, and helped applicants complete the application forms.

37. In 2005, seasonal harvest workers had to make their own arrangements for traveling to Medford. Returning employees received a "Welcome Back Bonus" of $89.98, intended in part to reimburse them for travel expenses. Iboa supplied Payroll with names of returning employees in advance.

38. In 2005, Bear Creek offered a Referral Bonus of one hundred dollars to any returning employee who referred a new worker for the 2005 harvest. The bonus was paid at the end of the harvest, provided both the referring employee and the person referred completed the harvest and earned a Stay Bonus. Plaintiff Villegas-Meza received bonuses for referring at least 14 new workers.

39. In 2005, Plaintiffs Ceja-Ceja, Fimbres Romero, and Urbalejo-Rodriguez each submitted an employment application to Bear Creek at least several weeks before traveling from Arizona to Medford. The employment application form was furnished to these Plaintiffs by Iboa, whether directly or by mailing the form to a past employee and requesting that person give it to a prospective new employee.

40. A written disclosure of the terms and conditions of employment, transportation, and housing was posted at Bear Creek's Employment Center in Medford. Written disclosures were not included with the postcards and employment applications Bear Creek mailed to prospective new and returning employees in 2005.

Iboa did not distribute or make available written disclosures when meeting with prospective new and returning employees at the Park in San Luis in 2005.

41.  The material terms and conditions of employment, transportation, and housing did not differ much between 2004 and 2005.  Any notable changes were disclosed orally by Iboa on the telephone or at the Park in San Luis.

**Recruiting Seasonal Workers in 2006**

42.  Bear Creek revised its recruitment plan for the 2006 harvests.  For the first time, Bear Creek chartered buses to transport workers from San Luis to Medford.  Recruitment efforts centered on identifying returning and new workers and ensuring they were aboard the bus to Oregon.  Bear Creek's 2006 recruitment plan emphasized in-person recruiting.

43.  For 2006, Iboa again telephoned and/or sent postcards to seasonal harvest workers who were employed by Bear Creek in previous years and had completed the season in good standing.

44.  Plaintiffs Fimbres Romero, Urbalejo-Rodriguez, Valenzuela-Becerra, Villanueva-Hernandez and Villegas-Meza each received a postcard from Bear Creek concerning the 2006 harvests.

45.  Iboa mailed employment applications to returning employees who had informed Iboa they knew of others interested in working the 2006 harvest.

46.  Iboa made several trips in 2006 to recruit and hire harvest workers, including visits to Nogales and Yuma, Arizona. However, Bear Creek continued to obtain most seasonal harvest workers from San Luis, Arizona.

47.  On May 27 and 28, 2006, Iboa met with numerous individuals at the Park in San Luis.  The event had been advertised in the 2006 postcard.

48.  Iboa traveled to San Luis in July 2006 to recruit and hire workers for the peach harvest.  He identified 47 individuals who he expected would ride the chartered bus to Oregon to work the peach harvest.  Only 35 actually boarded.  Plaintiffs Fimbres Romero, Padilla-Ortiz, Palacios-Torres, and Villegas-Meza were among the passengers on the "peach" bus.

49.  Plaintiffs Jacobo Bobadilla-German and Mauro German-Sanchez met with Iboa at the Park in San Luis.  Iboa told them he already had enough workers to fill the peach harvest bus. Shortly after the bus had departed, Iboa told Plaintiff Villegas-Meza more workers were needed.  Villegas-Meza telephoned Elias or Jacobo Bobadilla-German, or both.  Elias and Jacobo Bobadilla-German, and German-Sanchez, drove together from San Luis to Bear Creek's Employment Center in Medford.  All were returning employees who previously had worked the harvest for Bear Creek.

50.  While in San Luis in July 2006, Iboa met with approximately two hundred past employees and other persons interested in working the pear harvest.  Iboa informed them he would return later with additional buses to gather workers for the pear harvest.  "[T]hey told me that they would spread the word around for anyone that was interested once I communicated to the[m] the dates of my arrival in San Luis."

51.  Iboa returned to San Luis in August 2006 to recruit and hire workers for the pear harvest and ensure that they arrived in

Medford.  Bear Creek chartered five buses, each with a capacity of 47 passengers.  Iboa drew large crowds when he stood on the table in the Park and spoke.  The number of individuals seeking employment greatly exceeded the number of available bus seats. Iboa conducted a raffle in San Luis to select five new employees from among approximately 160 hopefuls.

52.  In 2006, Plaintiffs Pantoja-Ramirez, Urbalejo-Rodriguez, Valenzuela-Becerra, and Villanueva-Hernández traveled from San Luis to Medford on "pear" buses chartered by Bear Creek.

53.  A written disclosure of the terms and conditions of employment, transportation, and housing was posted at Bear Creek's Employment Center in Medford, Oregon.  Written disclosures were not included with the postcards and employment applications Bear Creek mailed to prospective new and returning employees in 2006.  Iboa did not distribute or make available written disclosures when he met with prospective new and returning employees at the Park in San Luis in 2006, or to pickers riding the chartered buses to Medford.

54.  Iboa's oral presentation at the Park in San Luis was helpful.  Some prospective employees have limited reading skills and rely mostly on oral communications.  The oral presentation by itself was insufficient to ensure that all required information was communicated to each person recruited.  Most of those recruited at the Park already knew the essential information or heard Iboa's presentation.  However, some individuals did arrive after Iboa had commenced his presentation, which was not repeated for these newcomers.  Some listeners also had difficulty hearing

Iboa, for medical reasons or simply because the crowd was large.

55.  In addition to the group presentation, Iboa and his assistants spoke with prospective new workers individually at the Park.  During those smaller conversations they communicated further information regarding transportation, employment, and housing at Bear Creek, and answered questions.

56.  Bear Creek's management recognized that Iboa needed a Migrant and Seasonal Agricultural Worker Protection Act disclosure notice for his recruitment trip.  In an email dated July 11, 2006, the Senior Vice President of Orchards, Ron Henri, recommended that Iboa provide a written disclosure to each recruited employee and have "a signed acknowledgment of receipt/understanding [from the employee] in Gume's hand before departure to Oregon."  Although that did not occur in 2006, there is no evidence Bear Creek's management was trying to hide anything from prospective employees or that Bear Creek profited by not providing written disclosures.

57.  Bear Creek's management has taken appropriate steps to correct that omission for future years.

**Wage Rates and Bonuses**

58.  In 2004, workers were paid $7.50/hour for picking peaches, with an end of season "stay bonus" of an additional $1.00/hour for each peach-picking hour.  Employees were paid $8.50/hour for picking pears.  Employees who stayed until the end of the harvest received an additional $1.50/hour "stay bonus" for each pear-picking hour worked.

/ / / /

59. For 2005, Bear Creek simplified the wage rate structure, offering the same rate for peaches and pears: $8.50/hour for picking, and a $1.50/hour "stay bonus."

60. For 2006, the hourly wage was increased to $9.00/hour for picking, with a $1.50/hour stay bonus.

61. Although not legally required, Bear Creek voluntarily pays overtime (at 1.5 times the regular hourly rate) to pickers for hours worked in excess of eight in a day or forty in a week.

62. Employees worked in four person crews. A crew was expected to pick 32 bins of acceptable quality pears in a day. Crews that picked a quantity greater were eligible for a production bonus (also known as a "Gainshare" bonus). Employee pay was not reduced for failing to achieve the production standard. Employees who consistently failed to meet the standard might be discharged for "inability to meet company standards" or not invited to return the next year.

63. In 2006, Bear Creek determined that fruit picked on the final two days of the harvest would not be eligible for a production bonus. Since the bonus considers both quality and quantity of fruit, Bear Creek determined it would be impractical to compute the amount due each worker for those two days in time to prepare final paychecks.

64. The "Referral Bonus" and "Welcome Back Bonus" were discontinued in 2006. Bear Creek did pay a travel allowance in 2006 to 75 workers who traveled at least 25 miles to Medford and had made their own travel arrangements. The base travel allowance was $59.99. Plaintiffs Elias Bobadilla-German, Jacobo

Bobadilla-German, and Mauro German-Sanchez received the travel allowance in 2006.

65. Following the pear harvest, Bear Creek provided (at considerable expense to itself) four chartered buses to transport seasonal workers desiring to return to San Luis.

66. Employees sometimes were asked to perform orchard maintenance tasks, such as tying branches and weeding. These tasks were compensated at a lower hourly rate than for picking fruit. No stay bonus or production bonus was paid for non-picking hours.

**Wage Advances**

67. In 2006, Bear Creek provided Plaintiffs Fimbres Romero, Padilla-Ortiz and Villegas-Meza with an advance on their first pay check for purpose of subsistence. The balance due the employee for the first pay period was paid in the first regular pay check.

68. In 2005, Bear Creek provided Plaintiffs Ceja-Ceja and Fimbres Romero with an advance on their first pay check for purpose of subsistence.

69. These wage advances were not loans.

**Housing and Meals**

70. Bear Creek has, for many years, made temporary housing available for use by its seasonal harvest employees. Prior to the commencement of each harvest season, Bear Creek obtained and updated any necessary permits for the housing from Oregon's Occupational Safety and Health Administration. During the period at issue here, the housing facilities were appropriately

permitted, licensed, and inspected.  The evidence indicates the
employee housing is safe and sanitary.  The few problems noted
were typical of issues any landlord may experience when housing
hundreds of persons.

71.  The only serious problem cited by Plaintiffs was an
overflowing septic tank at one location in August 2006.  As soon
as was reasonably possible, Bear Creek corrected that situation.
The employees residing there were relocated.  Plaintiffs Fimbres
Romero and Padilla-Ortiz had to leave some food behind, as the
facility they were moved to lacked kitchen facilities.  Bear
Creek waived the rent charge for three days.

72.  Residing at Bear Creek's employee housing is optional.
Bear Creek does not compel seasonal harvest employees to reside
in employee housing.  They may reside elsewhere if they choose,
and some do.  No person was denied the opportunity to work for
Bear Creek during the harvest because the person declined to
reside in Company housing.  The seasonal harvest employees are
not on-call workers.

73.  All named Plaintiffs, and all or nearly all Class
members, occupied employee housing while employed at Bear Creek.
Most employees traveling from outside the Medford area elect to
use employee housing because it has advantages over a private
rental.  Employee housing is available on a short-term basis, for
the duration of employment, an important benefit given the
difficulty in forecasting the precise dates the harvest will
begin and end.  Employee housing frees the employee from making
separate housing arrangements, paying rent in advance along with

a cleaning and security deposit, negotiating a rental contract in a language he may be unable to read, undergoing a credit check, or paying for extra days or even weeks that are not used. Bear Creek furnishes clean bedding for employees. Kitchen facilities are available in some employee quarters.

74. Bear Creek also benefits in a variety of ways by offering employee housing.

75. During pear harvest, Bear Creek operates employee cafeterias that serve three meals a day, except on Sunday when two meals are offered. During peach harvest, when there are too few seasonal harvest employees to justify operating the cafeteria, harvest employees are housed in quarters equipped with kitchen facilities.

76. Bear Creek provides buses to transport seasonal harvest employees between employee housing, the cafeteria, and the orchards. A bus is made available on certain other occasions such as traveling to church on Sunday or to the grocery store if employees wish to purchase food during peach harvest. Employees generally do not need a private vehicle, especially now that Bear Creek provides direct bus transportation to and from San Luis.

77. During 2004 and 2005, Bear Creek charged five dollars a day to occupy employee housing. During pear harvest, meals were included at no additional charge. In 2006, Bear Creek charged seven dollars a day to occupy employee housing. Again, meals were included during pear harvest at no additional charge. The price charged is well below the cost Bear Creek actually incurs to operate the employee housing and cafeteria, and considerably

less than the cost employees would incur to obtain comparable services in the community.  The Court is not aware of any serious complaints regarding either the quality or quantity of meals provided at the Bear Creek cafeteria.

78.  As a condition of occupying housing, employees signed an agreement to abide by the Housing Rules and pay a charge for any unreturned bedding.  Employees also signed a form authorizing Bear Creek to deduct the daily rental fee from their paychecks.

79.  The housing deduction authorization form was signed, along with other paperwork, when the new or returning employee arrived at Bear Creek's Employment Center in Medford.  Benny Suarez was the Housing Supervisor.  Under the management of the Orchards Division, Suarez collected signed housing wage deduction authorization forms from newly arrived seasonal harvest employees and forwarded the forms to Bear Creek's payroll department for processing.  The signed deduction authorization was the catalyst for the actual deduction from the employee's pay.  No deduction would be made without a signed deduction authorization form.

80.  Somehow the housing deduction authorization forms were misplaced for two busloads of 2006 seasonal harvest workers.  Also, a number of forms were signed by Suarez but not by the seasonal workers.  However, payroll department employees testified, and Suarez confirmed, that Suarez would not send a deduction authorization form to the Bear Creek payroll department for processing unless the form had been signed by the seasonal harvest worker.  The missing forms either were misplaced or mistakenly destroyed some time after payroll data was entered.

16 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

81. Bear Creek has produced signed 2004 and 2005 housing deduction authorization forms for all Plaintiffs who were employed by Bear Creek those years.

82. Bear Creek has produced signed 2006 housing deduction authorization forms for all but two Plaintiffs employed by Bear Creek in 2006.

83. Bear Creek paid Germán-Sánchez a $200 penalty when the company could not locate his signed authorization form for 2006.

84. Valenzuela-Becerra, the other Plaintiff whose 2006 housing deduction authorization form was not found, testified at deposition that he signed a housing deduction authorization form from 2001 through 2008. At trial he testified he did not recall signing such a form in 2006. After hearing his testimony, I find he did sign such a form in 2006.

85. Bear Creek did not deduct money from employee paychecks for housing unless the payroll department received a signed authorization form. Any deduction forms that were misplaced were not misplaced intentionally.

86. If any seasonal harvest employee neglected to sign the housing authorization form, it was an oversight. Returning employees knew Bear Creek takes a deduction for housing, and the amount, and Iboa made a point of explaining this to prospective new employees. No Plaintiff contemporaneously objected to the deduction being taken from each paycheck for housing. No Plaintiff, and no Class member, was harmed or disadvantaged in any way by a failure, if any, to obtain a signed deduction authorization from that individual for a particular season.

**Omission of Required Information on Wage Statements**

87.  The wage statements Bear Creek furnished to seasonal harvest employees with their paychecks in 2005 and 2006 identified the employer as Bear Creek Orchards, but did not include the employer's address and Employer Identification Number ("EIN").  Bear Creek's address and EIN do appear on the W-2 statements furnished to employees for each tax year.

88.  Plaintiffs presented no evidence they were harmed or disadvantaged in any way by omission of the address and EIN from the wage statements.

**Misrepresentations**

89.  Before Iboa traveled to San Luis on his August 2006 recruiting trip, Bear Creek's Director of Administrative Planning, Scott Cully, furnished Iboa a list of "Talking Points to Review with Bussed Pickers BEFORE they Agree to Travel to BCOI for Harvest 2006" "in an effort to prevent 'YOU DIDN'T TELL ME'".

90.  Iboa did not affirmatively misrepresent to any Plaintiff the material terms and conditions of employment during 2004, 2005, and 2006.

**Final Paychecks**

91.  During 2004, 2005, and 2006, when Bear Creek employees were laid off, the departing employees received final paychecks between 10:00 a.m. and noon on the morning following the last day the employee performed work.

92.  Given the large number of employees being separated, it is burdensome and costly for Bear Creek to provide final paychecks on the last day the employee performs work.

93.   For the 2005 harvest, Plaintiff Urbalejo-Rodriguez last performed work on Saturday, September 24.  His final paycheck was mailed on September 30, 2005.  The parties dispute whether Urbalejo-Rodriguez was laid off on September 24, or simply failed to appear for work on the days that followed and was deemed to have resigned.  The Court finds it was the latter. Urbalejo-Rodriguez volunteered for the first layoff.  He was not selected because it was his first year and others with greater seniority were allowed to leave first.  He left anyway.

94.  For the 2006 harvest, Plaintiff Palacios-Torres last performed work on September 8, 2006.  Bear Creek terminated his employment when Palacios-Torres failed to appear for three consecutive workdays (September 12, 2006).  A final paycheck was mailed to him on September 13, 2006.

95.  During the 2006 harvest, Germán-Sánchez reported an illness for which he received medical treatment.  His employment then terminated.  He returned to Mexico, with Bear Creek providing his bus ticket.  Bear Creek mailed him a final paycheck on the day his employment terminated.  Bear Creek then inadvertently mailed him a second final paycheck, thereby overpaying him by $212.48.  Bear Creek did not require German-Sanchez to return the overpayment.

96.  Bear Creek's conduct throughout the time period involved was in good faith and with careful attention to the needs of the workers.  The plaintiffs were pleased with the conduct of Bear Creek as evidenced by the frequent returning to the jobs year after year.

97.  Bear Creek's practice of relying upon returning employees and referrals illustrates the importance Bear Creek places upon maintaining good labor relations.  For a workforce of this size, the record evidences few complaints or problems of any substance.  The company acted quickly to address any issues that did arise.

98.  Nothing in the evidence indicates any intention to mistreat seasonal harvest workers.

99. Plaintiffs made a written demand for damages, including unpaid wages, more than 30 days before filing this action.

100. The parties attempted, without success, to resolve the issues in dispute without litigation.

### CONCLUSIONS OF LAW

1.  The Court has federal question jurisdiction over the claims for violation of the Migrant and Seasonal Agricultural Workers Protection Act, 29 U.S.C. § 1801 et seq. ("AWPA").

2.  The Court has supplemental jurisdiction over the state law claims.  They arise from the same factual nucleus and are part of the same case or controversy.

3.  Venue is proper in the District of Oregon, where Bear Creek is based and a substantial portion of the activities in question occurred.  28 U.S.C. § 1391(b).

**Claim One -- Agricultural Workers Protection Act**

4.  Bear Creek is an "agricultural employer" as defined in 29 U.S.C. § 1802(2).

5.  Plaintiffs and all Class members are "migrant agricultural workers" as defined in 29 U.S.C. § 1802(8) who Bear

Creek engaged in "agricultural employment" as defined in
29 U.S.C. § 1802(3).

6.   29 U.S.C. § 1854(a) establishes a private right of
action for any person aggrieved by a violation of this chapter or
any regulation under this chapter.

7.   A court may award damages for intentional violations of
any provision of AWPA or its implementing regulations, "up to and
including an amount equal to the amount of actual damages, or
statutory damages of up to $500 per plaintiff per violation.
29 U.S.C. § 1854(c)(1).  Multiple violations of a single
provision are treated as a single violation for purposes of
determining the amount of statutory damages due a plaintiff.

8.   In a class action, damages for violations of AWPA are
limited to the lesser of up to $500 per plaintiff per violation,
or up to $500,000.  Id.

9.   In determining the amount of damages to be awarded, a
court is authorized to consider whether an attempt was made to
resolve the issues in dispute before the resort to litigation.
29 U.S.C. § 1854(c)(2).

10.   Additional factors to consider when determining an
appropriate award include: (1) the amount of award to each
plaintiff; (2) the total award; (3) the nature and persistence of
the violations; (4) the extent of the defendant's culpability;
(5) damage awards in similar cases; (6) the substantive or
technical nature of the violations; and (7) the circumstances of
each case.  Herrera v. Singh, 103 F. Supp. 2d 1244, 1248 (E.D.
Wash. 2000).

11.  An award of damages should be sufficient to promote enforcement of the Act and deter violations, encourage workers to assert their statutory rights, and to compensate injuries of farm workers, yet not be disproportionately punitive to the offense. See Martinez v. Shinn, 992 F.2d 997, 999 (9th Cir. 1993); Six Mexican Workers v. Arizona Citrus Growers, 904 F.2d 1301, 1309 (9th Cir. 1990); Alvarez v. Longboy, 697 F.2d 1333, 1340 (9th Cir. 1983); Beliz v. W.H. McLeod & Sons Packing Co., 765 F.2d 1317, 1332-33 (5th Cir. 1985).

12.  Unlike many civil rights statutes, AWPA lacks an attorney fee-shifting provision.  See Alvarez, 697 F.2d at 1340-41 (interpreting predecessor statute).  If Plaintiffs prevail on their individual or class claims for violation of AWPA, any attorney fees awarded to counsel in connection with such claim will come from the damages awarded.  The Court may take this into account when considering the adequacy of any award of damages. See Beliz, 765 F.2d at 1332 ("Nor should a worker who sues for violations find recovery inadequate to cover his personal costs in filing suit, testifying, and paying attendant attorney's fees, recovery of which is not allowed by the Act").

**Class Claim -- Failure to Provide Written Disclosures**

13.  Pursuant to 29 U.S.C. § 1821(a), an agricultural employer that recruits any migrant agricultural worker must ascertain and disclose in writing certain information at the time of the worker's recruitment.

14.  Requiring that written disclosures be made at the time of "recruitment," rather than "employment," is intended to

protect migrant farmworkers who may travel long distances to the advertised worksite only to find work is unavailable, material circumstances are not as were represented, or that the employer now seeks to vary important terms or conditions of employment.

15.  Bear Creek "recruited" migrant agricultural workers in 2005 and 2006 by various means including the presentations Iboa made in San Luis; telephone calls or other means of direct communication by Iboa and his assistants or from persons acting at their behest; written communications such as postcards and employment application forms; and recruitment by other workers who received a referral bonus or travel pay for those efforts.

16.  The migrant agricultural workers who rode the employer-supplied buses to Oregon in 2006 were "recruited" by Bear Creek for purposes of 29 U.S.C. § 1821(a).

17.  Each Plaintiff employed by Bear Creek in 2005 or 2006 was "recruited" by Bear Creek to come to Oregon to work the peach and/or pear harvest.

18.  Bear Creek violated 29 U.S.C. § 1821(a) by not providing written AWPA disclosures at the time of recruitment in 2005 and 2006.  Bear Creek did give oral disclosures, but that is insufficient to meet the requirements of the statute.  Alvarez, 697 F.2d at 1340.

19.  Bear Creek had the ability to provide written AWPA disclosures at the time of recruitment in 2005 and 2006.

20.  Bear Creek does not dispute that any failure (if the Court found one) to furnish written disclosures when recruiting workers is considered "intentional" for purposes of 29 U.S.C.

§ 1854(c).  Specific intent to violate AWPA is not necessary, nor actual knowledge of the law's requirements, <u>Bueno v. Mattner</u>, 829 F.2d 1380, 1385-86 (6th Cir. 1987).  It is sufficient that Iboa, who Bear Creek had placed in charge of recruiting, knew that he was not providing written disclosures when he solicited migrant workers to work the harvest for Bear Creek.  <u>See</u> <u>Herrera v. Singh</u>, 103 F. Supp. 2d 1244, 1248 (E.D. Wash. 2000).

21.  For purposes of computing damages, the Court will treat a failure to provide written disclosures to a particular worker in a given year as a single violation, even if more than one communication was made to the worker.  The workers traveled to Oregon only once in response to the various solicitations.

22.  Bear Creek presently furnishes written disclosures to workers it recruits, before they depart for Oregon.  The disclosures are in Spanish.  Since literacy levels vary between workers, Iboa also reads the disclosure aloud to the recruited workers and invites questions.

23.  The Court awards damages under AWPA of $75 per violation for failure to provide written disclosures at the time of recruiting.

**Individual AWPA Claims**

24.  Bear Creek did not knowingly provide false or misleading information to Plaintiffs at the time of recruitment, within the meaning of 29 U.S.C. § 1821(f).

25.  Bear Creek did not violate 29 U.S.C. § 1832(c) "by breaching the working arrangements," as Plaintiffs have alleged.

26.  Bear Creek did not violate 29 U.S.C. § 1823(a) by allegedly "providing [the Plaintiffs with] housing that failed to meet substantive health and safety standards."  The few reported problems were addressed with reasonable alacrity.

27.  Bear Creek acknowledges some employees were relocated from an employee housing facility in August 2006 after a septic system problem resulted in a sewage back up.  Plaintiffs Fimbres Romero and Padilla-Ortiz testified, and Bear Creek did not dispute, they had to leave groceries behind.  The employee housing they were moved to lacked kitchen facilities.  Bear Creek did waive the rental charge for the three days that the sewage problem persisted, which is appropriate, but did not compensate Fimbres Romero and Padilla-Ortiz for the groceries lost.  I award these two Plaintiffs $35 each, as a reasonable estimate of the value of that food.

28.  Bear Creek concedes it violated 29 C.F.R. § 500.80(d) by not including the company's Employer Identification Number ("EIN") on the wage statements furnished to Plaintiffs in 2005 and 2006.  Bear Creek does dispute whether the violation was "intentional," reasoning it had nothing to gain by omitting the information.  Proof of improper motive is not required in order to establish a violation of the regulation.  Federal law requires that the EIN appear on each wage statement.  Bear Creek is responsible for knowing the applicable laws governing employment of migrant workers.  Absence of ulterior motive is a factor the Court may properly consider in determining what remedy to impose.

29.  The parties dispute whether Bear Creek's address appears on the wage statement.  Because Bear Creek has already conceded the wage statements were deficient, it is not necessary to decide whether the address information was inadequate as well.

30.  Finally, the parties dispute whether the required information must appear on a payroll check stub or similar document that can be retained by the employee rather than appearing only on the actual payroll check that must be surrendered when cashing the check.  Including the information on the portion retained by the employee is the better practice.  It also is more consistent with the language of 29 C.F.R. § 500.80(d), which requires agricultural employers to provide migrant workers "with an itemized written statement of this information at the time of payment for each pay period . . . ."

31.  The Court awards the twelve individual Plaintiffs $50 each in damages for the failure to include required information on the payroll stubs.

32.  Plaintiffs also contend Bear Creek violated 29 U.S.C. § 1822(a) and 29 C.F.R. § 500.81 by failing to "pay the wages owed such worker when due."  In the context of this case, when the wages were "due" requires resolution of state law claims that are discussed below.

**Claim Two -- Oregon Minimum Wage Law (Class Claim)**

Plaintiffs advance two theories.

**<u>Private Benefit of the Employee</u>**

33.  The claim asserted on behalf of Sub-Class Two-A argues that Bear Creek was not legally entitled to receive a credit,

against minimum wage, for employee housing.  After eliminating
that wage credit, the wages of these employees would fall below
the State minimum wage for one or more pay periods.

34.   Pursuant to ORS 653.035(1), "[e]mployers may deduct
from the minimum wage to be paid employees . . . the fair market
value of lodging, meals or other facilities or services furnished
by the employer for the private benefit of the employee."

35.   ORS 653.040(3) authorizes the Commissioner of the
Oregon Bureau of Labor and Industries to "[m]ake such rules as
the commissioner considers appropriate to carry out the purposes
of ORS 653.010 to 653.261, or necessary to prevent the
circumvention or evasion of ORS 653.010 to 653.261 and to
establish and safeguard the minimum wage rates provided for under
ORS 653.010 to 653.261."

36.   Oregon Administrative Rule (OAR) 839-020-0025(1)
provides, in relevant part, that "[t]he fair market value of
meals, lodging and other facilities or services furnished by the
employer to the employee for the private benefit of the employee
may be deducted from the minimum wage."

37.   OAR 839-020-0025(3) provides, in relevant part, that
"[i]n order for the employer to be able to claim credit toward
the minimum wage for providing meals, lodging or other facilities
or services furnished to an employee, the deduction of these
costs from the employee's wages must have been authorized by the
employee in writing, the deduction must have been for the private
benefit of the employee, and the deduction must be recorded in
the employer's books . . . ."

27 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

38. OAR 839-020-0025(5) provides, in relevant part, that

> The provisions of section (1) of this rule apply only when the following conditions are continuously met:
>                     * * * *
> (b) The employee actually receives the meals, lodging or other facilities or services; and
>
> (c) The meals, lodging or other facilities or services are furnished by the employer for the private benefit of the employee . . . .
>
>                     * * * *

39. Plaintiffs have tried, without success, to create an issue regarding meals. The undisputed evidence is that meals were provided regularly at the employee cafeteria and through other means. Under the type of plan at issue here, where a fixed amount is deducted daily for housing and all meals, the employer is not obligated to track whether each employee actually chooses to eat breakfast or lunch or dinner on a given day. The recordkeeping would be burdensome and serve little purpose, since it was not a pay-per-meal plan.

40. The parties dispute whether the housing was "furnished by the employer for the private benefit of the employee."

41. Plaintiffs point to various ways Bear Creek benefits by having employee housing. That employer and employee both derive some sort of benefit from having employee housing is not sufficient, in itself, to deny the employer a credit against the minimum wage pursuant to OAR 653.035(1) and OAR 839-020-0025. A rational business generally engages in activities its managers believe will benefit the business.

28 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

42.  OAR 839-020-0025(7) provides that:

Lodging or other facilities or services are furnished
for the private benefit of the employee when such
lodging or other facilities or services are not
required by the employer.  For purposes of this rule,
lodging or other facilities or services are required by
the employer when:

> (a) Acceptance of the lodging or other facilities
> or services is a condition of the employee's
> employment; or
>
> (b) The expense is incurred by an employee who
> must travel away from the employee's home on the
> employer's business; or
>
> (c) The acceptance of the lodging or other
> facilities or services is involuntary or coerced;
> or
>
> (d) The provision of lodging or other facilities
> or services is necessary in order for the employer
> to maintain an adequate work force at the times
> and locations the employer needs them.

43.  Paragraphs (a) and (c) are inapplicable here.  Bear
Creek did not compel seasonal harvest employees to accept lodging
or meals.

44.  Paragraph (b) likewise is inapplicable.  Plaintiffs are
not traveling salesmen temporarily away from home on their
employer's business.  The inquiry normally begins by asking where
the employee is regularly stationed with respect to this
employer.  For Bear Creek, that is in Medford.  That Plaintiffs
traveled a long distance to accept the employment opportunity
does not alter the fact that Plaintiffs never were stationed in

29 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

Arizona for this employer.  Arizona is merely the place they were recruited.

45.  The dispositive language is paragraph (d).  Plaintiffs reason that providing employee housing is essential for Bear Creek to muster the 50 workers needed for the peach harvest and the 300 or more workers required for pear harvest.  Accordingly, Plaintiffs argue, "[t]he provision of lodging . . . is necessary in order for the employer to maintain an adequate work force at the times and locations the employer needs them."  OAR 839-020-0025(7)(d).

46.  Bear Creek responds that (7)(d) of the regulation addresses situations where an "on call" employee must reside at employer-furnished housing.  I agree with Bear Creek's interpretation of the regulation.

**Written Authorizations for Wage Deductions** (Class Claim)

47.  Plaintiffs' second theory is that even if Bear Creek ordinarily would be entitled to receive a credit against minimum wage for employee housing, Bear Creek neglected to obtain written authorization from some employees for that wage deduction.  If Bear Creek was not entitled to that wage credit, Plaintiffs argue, the wages of these employees were below the State minimum wage for one or more pay periods.  This claim is asserted on behalf of Sub-Class Two-B.

48.  OAR 839-020-0025(3) provides, in relevant part, that "[i]n order for the employer to be able to claim credit toward the minimum wage for providing meals, lodging or other facilities or services furnished to an employee, the deduction of these

30 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

costs from the employee's wages must have been authorized by the employee in writing . . . ."

49. I have found that Plaintiffs did authorize deductions from their wages for housing. As Bear Creek did not take deductions without a signed authorization from the employee, the state minimum wage law was not violated.


**Claim Three -- Failure to Obtain Written Authorization**

50. ORS 652.610(3) prohibits an employer from taking deductions from an employee's wages unless certain requirements are met. One requirement, for any deduction that is not compelled by law, is that the "employee has voluntarily signed an authorization for a deduction . . . ."

<u>**Deductions for Housing**</u> **(Class Claim)**

51. Consistent with my findings above, Bear Creek did not take deductions for housing unless it received an authorization signed by the employee. Consequently, no violation occurred.

<u>**Wage Advances**</u> **(Individual Claims)**

52. The wage advances paid to Plaintiffs, at their request upon arrival in Oregon, were not "loans." Consequently, Bear Creek was not required to obtain written authorization for a "deduction" pursuant to ORS 652.610(3)(c).


**Claim Four -- Failure to Pay Wages When Due**

53. Plaintiffs advance three theories here. All are advanced on behalf of the named Plaintiffs individually, as the Court denied the tardy request to certify a class claim.

54.  Plaintiffs' first theory presumes they did not receive all wages due them, because Bear Creek improperly deducted for housing or wage advances.  Since I have determined the housing deduction and wage advances were lawful, this claim fails.

55.  Plaintiffs' second theory is that employees who were laid off or otherwise discharged were entitled to receive their final paychecks on the last day they performed work.

56.  ORS 652.145 provides, in relevant part, that

> [I]f an employee has worked for an employer as a seasonal farmworker, whenever the employment terminates, all wages earned and unpaid become due and payable immediately.  However, if the employee quits without giving the employer at least 48 hours' notice, wages earned and unpaid are due and payable within 48 hours after the employee has quit, or at the next regularly scheduled payday after the employee has quit, whichever event first occurs.
>
> Oregon Administrative Rule 839-010-0440 provides that:
>
> (1) When a seasonal farmworker . . . terminates employment because of discharge or mutual consent, all wages earned and unpaid become due and payable on the last day the employee works.
>
> (2) When a seasonal farmworker . . . quits employment and gives the employer at least 48 hours notice of intent to quit, all wages earned and unpaid become due and payable on the last day the employee works.
>
> (3) When a seasonal farmworker . . . quits employment and fails to give the employer at least 48 hours notice, all wages earned and unpaid become due and payable within 48 hours after the employee quits or on the next regularly scheduled payday, whichever comes first.

57.  Bear Creek acknowledges it provided final paychecks the morning after the last day the employee performed work.  Bear Creek contends the employee is not terminated until that next day.  Although this is a reasonable construction of the statute, the Commissioner of the Bureau of Labor and Industries has interpreted the statute differently, and has promulgated a regulation that provides accordingly.  OAR 839-010-0440(1).  It is difficult to construe the words "the last day the employee works" in the regulation as anything other than the last day the employee actually performs work.

58.  Bear Creek also argues it is not practical to prepare numerous employee paychecks in the short time permitted by the regulation.  It will be burdensome and costly to accomplish, but it is possible.  The "same day" rule applies only to employees the employer chooses to let go, or if they mutually agree on termination.  Bear Creek can specify how many hours the employee will work the final day, and prepare final paychecks accordingly. If the employee fails to work that number of hours, without the employer's acquiescence, the quits-without-notice rule applies, and the final paycheck is not due for 48 hours.  ORS 652.145(3).

59.  As a practical matter, this regulation may induce an employer to reduce the number of hours worked on the final day, to leave sufficient time to prepare final paychecks.  Thus, the rule may actually harm the persons it is intended to protect. The wisdom of the regulation is a judgment to be made by Oregon's Legislature and the Commissioner of BOLI.

/ / / /

60.  After working the final day of the 2006 pear harvest, Plaintiffs would have remained at Bear Creek overnight to board the chartered bus returning them to San Luis.  In addition, Bear Creek arranged for a bus to transport departing employees to a bank to cash checks, as most lacked private transportation. Imposing a penalty for 2006 is pointless.  Plaintiffs incurred no harm by receiving their final paychecks when they did.

61.  As a remedy for the 2005 violation, the Court awards one day's wages, ORS 652.150, to Plaintiffs Valenzuela-Becerra, Villanueva-Hernandez, Villegas-Meza, and Ceja-Ceja.

62.  Paying these four individuals' wages the next morning technically was a violation of AWPA, as under state law the wages were "due" the night before.  An award of damages would duplicate the remedy already furnished by state law in a circumstance where no harm was suffered.  Therefore, the Court exercises its discretion and awards no damages under AWPA for this violation.

63.  The final paycheck mailed to Plaintiff Urbalejo-Rodriguez on September 30, 2005, was timely.

64.  The final paycheck mailed to Plaintiff Palacios-Torres on September 13, 2006, was timely.

65.  The final paycheck furnished to Plaintiff Germán-Sánchez in August 2006 was timely.

66.  The claim for late payment of wages, on the theory that Bear Creek improperly deducted certain amounts, fails.  The Court has determined that no improper deductions were taken.

/ / / /

/ / / /

## **ORDER**

67.  The parties shall furnish the Court with a proposed form of Judgment consistent with these rulings.

IT IS SO ORDERED.

DATED this 21st day of October, 2009.

/s/ Owen M. Panner
_____
                Owen M. Panner
                United States District Judge